INSURANCE CO. OF NORTH AMERICA v. FREDERICK LEY-
LAND & CO., Limited.

(District Court, E. D. Pennsylvania. July 8, 1909.)

No. 20.

SHIPPING (§ 132*)—CARRIAGE OF GOODS—INJURY TO CARGO—NEGLIGENCE IN
LOADING.

In a suit against a shipowner to recover for damage to a shipment of cotton from New Orleans to Liverpool, which on delivery was found to have been injured by fresh water, the evidence, including the testimony of an inspector of the New Orleans Cotton Exchange, given from his report made at the time, showing that a certain number of bales were loaded during rain, *held* sufficient to charge respondent with liability for the damage to such bales, but not to the remainder, which, so far as shown, may have been wet before they were delivered to the ship.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 132.*]

In Admiralty. On final hearing.
See, also, 139 Fed. 67.

Francis S. Laws and John F. Lewis, for libelant.
Howard H. Yocum, for respondent.

J. B. McPHERSON, District Judge. In June and July, 1903, Vincent & Hayne, cotton brokers and factors doing business in New Orleans, delivered to the steamship Darien, a vessel owned and operated by the Leyland Line, 2,152 bales of cotton to be carried to Liverpool for certain consignees named in the bills of lading. The bills were not offered in evidence, but the respondent admits that the cotton was accepted as "in apparent good order and condition." When it arrived in Liverpool, 1,877 bales were found to be more or less injured, and for this damage the libelant paid $2,789.66 in the following October. The policy of insurance was not offered in evidence, and it does not appear, therefore, under which provision of that contract the underwriter's liability arose; but, as no objection has been made to the libelant's right to bring the suit, I shall assume that the policy covered such damage as appeared when the cotton was unloaded at Liverpool, and that the underwriter may now recover, if Vincent & Hayne could have recovered in case they themselves had brought the suit.

The gravamen of the action is the respondent's negligence at the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

port of New Orleans at or before the date of loading the cotton. After averring the receipt of the bales upon the wharf on several days between June 30th and July 14th, the libel thus states the negligence complained of:

"IV. That while the said cotton was so in the possession of the said respondent for transportation as aforesaid, and while the same was in process of being loaded on board the said steamship Darien, the said respondent, its agents, servants, and employés, not regarding its said duty in the premises, did not take proper care of the said cotton, nor safely or properly stow the same on board the said steamship Darien, nor safely deliver the same in a like good order and condition at the port of Liverpool as when received. On the contrary, while the said cotton was in the custody and under the control of the said respondent, a large portion of it was allowed to become greatly wet by fresh water and otherwise damaged, and was stowed on board the said vessel in a wet and damaged condition, and other portions of the said cotton were allowed to become greatly wet and otherwise damaged while aboard the said vessel, by reason of the hatches being kept open during heavy and rainy weather, and other portions of the said cotton were allowed to become greatly wet and otherwise damaged, by being stowed in the same compartment and in proximity with the said cotton so wet as aforesaid and without proper dunnage.

"That by reason of the said improper and negligent care and stowage, and by reason of the lack of proper dunnage as aforesaid, the said cotton was greatly damaged, so that when the same was delivered at the port of Liverpool, 1,877 bales thereof were found to be damaged by the causes aforesaid, to the amount of $2,789.66."

The libelant undertook to prove the respondent's negligence in the foregoing respects, but the evidence offered is for the most part unsatisfactory. One reason for its lack of persuasiveness may perhaps be found in the delay in bringing suit, or, indeed, in making any claim upon the respondent for reimbursement. Although Vincent & Hayne were paid by the libelant not later than October 22, 1903, the present suit was not begun until May 5, 1905, nor was the claim brought to the respondent's attention meanwhile. No testimony was taken until December 12, 1905, so that, when the New Orleans witnesses were called, nearly 2½ years after the cotton was loaded, it is not surprising to find that without exception they had no recollection of the circumstances attending and preceding the shipment. No one remembered this particular cotton, or could testify directly about its condition. No one remembered the weather on the days when it was put on board the Darien, and the libelant's case in these important particulars depends wholly upon such inferences as may be drawn from the testimony of several witnesses concerning their custom in the transaction of business. For example, the actual condition of the cotton at the time it was delivered on the respondent's wharf is evidently an essential matter; but there is not a word of direct testimony upon this subject from any witness that was examined in New Orleans. Nearly all of the cotton was traced to or from various compresses; but no witness remembers it there, or gives us any first-hand information about its condition. What was offered upon the subject was this: Several witnesses were called through whose hands the cotton had passed, but none of them had any personal recollection about it. Two of

them were weighers, and testified concerning the character and extent of their duties. It appeared that they only examine the external appearance of each bale, and do not open it unless there is something on the outside to indicate that the contents have been damaged. If the bale is externally in good order, they go no further. This particular cotton, they say, must have been in good order, because they have no memoranda that it was in bad condition. The proprietors of several cotton presses were called, and they united in testifying that they had no personal knowledge of the cotton in question, but that it must have been in good condition, or it would not have been passed by their employés. They agreed that the examination made at a press goes no further than the outside of the bales, unless there is some external indication that the contents are not in good order.

Evidently this kind of testimony is not very convincing. It is concerned entirely with what "must have been," and is wholly based on the general course of business; but, even from the view point of the general course of business, it is plain that damaged cotton may successfully pass inspection, unless the outside of the bales invites attention to their contents. In the present case I think the weight of the testimony is decidedly in favor of the position that the bales were damaged before they reached the presses; for the testimony of ten witnesses (who were also called by the libelant) is to the effect that they examined the cotton on its arrival at Liverpool, where the bales were opened, and that the cotton was not only damaged on the outside, but also upon the inside—its condition at Liverpool being described from actual examination and personal recollection. This kind of testimony I regard as much more reliable than the testimony from New Orleans; and I have no hesitation in accepting it, and in finding therefrom that nearly all the cotton in question had already been injured when it was delivered to the ship, and that the injury was attributable to what is known as "country damage"—that is, damage that has been done by exposure to the weather at railroad stations, or at other places in the country, where bales are awaiting shipment—and that this may have been done several weeks before the cotton was delivered at New Orleans. In this connection it should not be overlooked that the insurance company's own surveyor at Liverpool attributed the injury to "country damage," and that the settlement of the loss was made upon this basis.

Thus far I have not referred to the testimony of G. W. Hayes, an inspector in the employ of the New Orleans Cotton Exchange. If it were not for his testimony, I think it is safe to say that the whole of the libelant's case would be very weak indeed; for, even with his testimony, there is still some doubt whether any part of the case has been made out. He made frequent reports to the Exchange, and a copy of his report concerning the Darien was offered in evidence without objection. The following is substantially a copy of his paper:

| Date. 1903. | | Bales. received. | Remarks. |
|---|---|---|---|
| July 9. | Night before: Cloudy. Morning: " Evening: " | 2,529 | Transferred from S/S Barbadian about 2,100 B/c on wharf and levee cov'd., commenced loading. |
| " 10. | Night before: Clear. Morning: Cloudy. Evening: Shower. | | About 1,500 B/c on wharf cov'd. |
| " 11. | Night before: Rain. Morning: Evening: Rain at 2 p. m. | | Worked during rain about 900 B/c on wharf & levee cov'd. Worked Sunday the 12th inst. during rain 167 B/c |
| " 13. | Night before: Clear. Morning: Cloudy. Evening: Showery. | | marked Plow–6, Hop–4, Duck–2, Bass–8, Fawn–9, Fish–4, Clay–7, Hter–1, Cleo–11, Juno–8, Mars–5, Iris–6, Fowl–8, Buty- 6, Foe-5, Loaf–3, Lamb–7, Safe–3, Uron–2, Mech–7, Nero–2, Eric–3, Pipe–7, Look–2, Lake–2, Utan–2, Shad–3, Frog–4, Nine–1, Goat–5, Curb–3, Barn–6, Carp–4, Gold–6. wet on wharf by rain and loaded in that condition. Wharf clear. |
| " 14. | Night before: Clear. Morning: " Evening: " | | Sailed last night with 2,529 B/c, not including 168 B/c in transit from Colon. |

In his examination in chief the witness seemed to be testifying, to some extent at least, from his personal recollection; but he explained on his cross-examination that he was relying wholly on his report (notes, page 16):

"Q. Therefore you know nothing about the cotton, except the dates on this page?

"A. Only on that page.

"Q. You have. 'On the eleventh worked during rain.' You don't say how long they worked. I don't suppose you remember anything about it beyond the entry here?

"A. No, sir.

"Q. Naturally, after the lapse of two years and a half, you have no recollection as to the dates it rained?

"A. The report of the Exchange shows the exact time it rained.

"Q. I am asking you about your memory?

"A. My memory? Couldn't go on that.

"Q. What you recall is what you see in your book?

"A. What is in that book.

"Q. And the extent of that rain, or duration of that rain, you don't remember anything of now, of your own knowledge?

"A. No, sir."

Giving his entries, therefore, the best effect they should receive, it appears that 167 bales were improperly loaded, because they were too wet to be prudently stowed. When they became wet the witness could not say. He did not know how long the cotton had been on the wharf, nor what its condition was when received, although, after it came into the ship's possession, it seems to have been covered with tarpaulins. He did not know how these 167 bales were stowed; but it is inconceivable that the damage to the other bales could have been caused by these, even if they had been saturated and had been deliberately stowed so as to touch as many dry bales as possible. As it seems to me, the testimony of the witness cannot possibly go farther than to show that 167 bales were stowed

in an unfit condition; and, after some hesitation, I have decided to hold the ship liable for this proportion of the damage that appeared when the cargo was unloaded at Liverpool. How far these wet bales may have affected the rest is too uncertain to be found as a fact, and I confine the vessel's liability, therefore, to $^{167}/_{1877}$ of the loss for which the libelant settled with the consignees. I am bound to add that I do not regard the proof upon this point as very satisfactory, and, if the Hayes report had not been offered, the evidence would be so indefinite that no recovery could be allowed. But, as that report was accepted without objection, I cannot help giving it a good deal of weight. It is a memorandum made at the time, comprising numerous details that add to its force. It was made in the course of official duty, and the probable inference from the entries is, I think, that the inspector was noting what he believed at the time to be an instance of negligent loading on the part of the ship.

No weight has been given in this decision to the vessel's log, or to the Liverpool carters' receipts.

A decree may be entered in accordance with this opinion, the total costs to be divided between the parties in the same proportion; that is to say, $^{167}/_{1877}$ thereof are to be paid by the respondent, and the remainder to be paid by the libelant.